IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


SERENA C. MOSER,                  )
                                  )
     Plaintiff,                   )
                                  )
     v.                           )      1:05CV00288
                                  )
MCC OUTDOOR, L.L.C.,              )
SHIVERS TRADING & OPERATING       )
CO.,                              )
                                  )
     Defendants.                  )


                        MEMORANDUM OPINION

OSTEEN, District Judge

     Plaintiff Serena C. Moser ("Plaintiff") brings this action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and North Carolina public policy against Defendants MCC Outdoor, L.L.C. and Shivers Trading and Operating Co. (collectively, "Defendants"). Pending before this court is Defendants' motion for summary judgment. For the reasons stated below, the court will grant Defendants' motion and enter an order and judgment in accordance with this opinion.

I.   **FACTS**

     One of Defendants' divisions, Fairway Outdoor Advertising of the Triad, hired Plaintiff on July 9, 2003. Plaintiff's termination occurred on June 30, 2004. Plaintiff was a Sales Representative, which involved calling potential customers and selling outdoor advertising spaces, such as roadside billboards.

Plaintiff worked with several fellow employees that are key to this case. Plaintiff's Sales Manager was Eddie Jones ("Jones"), and her General Manager was Dan O'Shea ("O'Shea"). Plaintiff reported to Jones, and Jones reported to O'Shea. Fellow Sales Representatives included George Wilkes ("Wilkes"), Kelly Phipps ("Phipps"), and Tom Poe ("Poe"). The working relationship between Plaintiff and these other employees was, described mildly, antagonistic. Plaintiff experienced various acts, occurring over her year-long employment, upon which she bases her claims. The court divides the conduct into (1) touching incidents, (2) statements, and (3) various other acts toward Plaintiff.

Several touching incidents occurred. Shortly after Plaintiff started work, Wilkes popped Plaintiff on her buttocks with a plastic water bottle. Poe, with whom Plaintiff often joked around, picked Plaintiff up into the air and tried to lift her skirt. Jones, at one point, pulled Plaintiff out of her chair. Plaintiff informed Jones that such conduct could make her skirt fly up. Phipps, after telling Plaintiff that she looked like a man, tried to touch Plaintiff's breasts. Plaintiff thwarted Phipps's attempt.

Jones also touched Plaintiff in several incidents. Jones once gave Plaintiff a side hug and squeezed her shoulder. Jones, while he and Plaintiff were in a Raleigh car dealership, side hugged Plaintiff in front of the car dealer associate and stated that he "takes care" of Plaintiff. After meeting Jones at an

afterwork gathering at a local restaurant, before Plaintiff departed, Jones hugged Plaintiff and kissed her head. At a local networking gathering, Jones put his arm around Plaintiff's waist, which caused Plaintiff to move away. Jones repeated the same maneuver, at which Plaintiff again moved. Finally, toward the end of October 2003, on a trip to Raleigh, Jones tried to place his hand on Plaintiff's leg, which caused Plaintiff to move her leg. Jones tried this maneuver several times as well. Finally, Jones hugged Plaintiff after the two went to a local gym together, although they exercised separately.

Additionally, fellow employees made several offensive statements to Plaintiff. Wilkes told Plaintiff to slow down in her stride because she was bouncing, apparently referring to Plaintiff's breasts. During a holiday party, Wilkes commented that he could see Plaintiff's underwear. Wilkes also called Plaintiff a "dingbat" and "dumb blonde" after Plaintiff had been in an accident in a company car, asked when Plaintiff planned to wreck another car, and told her he knew she would have an affair with someone in the office. Shortly after Plaintiff started working, Phipps told Plaintiff that he wished to have sexual intercourse with her.

Poe made many statements toward Plaintiff as well. Poe told Plaintiff that if he were not married, he would consider having sexual intercourse with Plaintiff. Poe shared personal information with Plaintiff on a regular basis, including his insecurity issues and the nature of sexual intercourse with his

3

wife.  Poe stopped describing acts with his wife after
Plaintiff's several requests to stop.  Poe told Plaintiff that a
prior female employee kept records of menstrual cycles of
employees.  Poe also stated, at various times, that it was the
"wrong time of the month" for Plaintiff and that he could tell
she was having sexual intercourse with a particular man she was
dating.  Finally, during March or April after Plaintiff started
work, Poe asked Plaintiff if she were wearing a thong.

Finally, Jones made several statements to Plaintiff.  Jones
told Plaintiff that it was common for women to prefer older men.
Jones also told Plaintiff, in December, he would lose twenty
pounds in order to be attractive to Plaintiff.  Jones, after he
and Plaintiff had had a disagreement, threw his arms into the air
and stated he loved Plaintiff.  In another incident, Jones and
Wilkes were discussing directions to Jones's house.  Wilkes said
he would just ask Plaintiff.  Jones responded that Plaintiff
should know the directions because she was often at Jones's house
when Jones's wife was away.  Jones also stated it was a good
thing Plaintiff exercised regularly because she did not have
sexual intercourse as an outlet for her energy.  Jones told
Plaintiff in another situation he would "do her."  Jones
communicated to Plaintiff his desire to engage in sexual
intercourse with women, commented on women's breasts and buttocks
in front of Plaintiff, and told Plaintiff he favored small
breasts.  Jones called Plaintiff a "hottie" when the two were in
a car together after Plaintiff said she was going to adjust the

4

car's heat.  Jones also stated that he cared deeply for
Plaintiff.  Jones, before leaving for a convention that he and
Plaintiff were attending, told Plaintiff that the hotel had a hot
tub, and so, she should bring a bikini.  Plaintiff stated that
was the last thing she would do.  Finally, Jones told another
employee, in Plaintiff's presence, that they should ask Plaintiff
about various sexual techniques.

Finally, Plaintiff witnessed or experienced several acts.  A
fellow employee took a picture of Plaintiff's buttocks without
Plaintiff's prior knowledge.  Plaintiff destroyed the photograph
when she finally saw it.  Jones showed Plaintiff a picture of a
little boy with a large phallus superimposed upon him saying that
this boy was he when he was young.  Plaintiff pinched Jones when
he showed her the picture.  Jones also, on a couple of occasions,
tried to look down Plaintiff's blouse.

Plaintiff complained about some of this conduct to her
supervisors.  During November and December, Plaintiff complained
to O'Shea about Wilkes's offensive comments.  O'Shea told
Plaintiff to take Wilkes in perspective.  Plaintiff also
complained to Jones about Wilkes.  After trying to mediate the
problem, Jones threatened to fire Plaintiff and Wilkes.  Wilkes
stated that he knew he was bothering Plaintiff to some extent.

Plaintiff's conduct at Fairway was not model either.  Fellow
employees complained about Plaintiff's loud and abrasive tone.
Plaintiff called fellow employees names like "baldy," "chubby,"
and "Lucifer."  During March and April of 2004, Plaintiff

5

received reprimands for her conduct in the office.  On June 30, 2004, an argument Plaintiff was having with another employee prompted O'Shea's attention.  O'Shea was in his office unable to hear the other end of his telephone conversation because of Plaintiff's dispute with a fellow employee.  O'Shea, allegedly upon witnessing this and because of Plaintiff's past conduct, fired Plaintiff.  Upon her termination, Plaintiff filed this action under Title VII and North Carolina law.

**II.  STANDARD OF REVIEW**

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issues of material facts exist, thus entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).  If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue does not remain for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a <u>genuine issue for trial</u>."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (citations & footnote omitted) (quoting Fed. R. Civ. P. 56).  The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are

reasonable.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).  However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine.  Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; 106 S. Ct. at 2510.

**III. ANALYSIS**

Plaintiff filed claims for gender-based disparate treatment, quid pro quo sexual harassment, retaliation, hostile work environment, and violations of North Carolina's public policy.  The court considers each in turn.

    A.    Gender-Based Disparate Treatment and Quid Pro Quo Sexual Harassment

Plaintiff's brief in opposition to Defendants' motion for summary judgment does not address the gender-based disparate treatment and quid pro quo sexual harassment claims.  Under these facts, the court considers summary judgment on those claims to be uncontested.  See L.R. 7.3(k), L.R. 56.1(e).  Because Defendants' uncontested argument appears to be reasonable, summary judgment on those grounds will be granted.

    B.    Hostile-Work-Environment Claim

Title 42 U.S.C. § 2000e-2(a) bars an employer from discriminating against an employee in his, among other things, terms of employment because of that employee's gender.  This includes creating a hostile work environment on the basis of

7

gender. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 73, 106 S. Ct. 2399, 2408 (1986).

> In order to succeed on a claim of hostile workplace harassment, the [complainant] must prove the following: (1) the harassment was because of sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer.

E.E.O.C. v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001). The court holds that Plaintiff fails as a matter of law to support the third element, and thus, further analysis is unnecessary.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993). A court makes this determination by examining all the surrounding circumstances, including

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Id. at 23, 114 S. Ct. at 371. The totality of the facts, moreover, must show more than unpleasantness, cruelness, or vulgarity. See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772-73 (4th Cir. 1997). "The concept of sexual harassment is designed to protect working [people] from the kind of . . .

8

Case 1:05-cv-00288-UA-JEP   Document 54   Filed 08/30/06   Page 8 of 14

attentions that can make the workplace hellish . . . ." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

To be actionable, the conduct must be more than isolated incidents of minor seriousness. See Weiss v. Coca-Cola Bottling Co. of Chi., 990 F.2d 333, 337 (7th Cir. 1993). In Weiss, a fellow employee of the plaintiff, within two weeks of the plaintiff's employment, began asking her about her personal life and giving beauty-related compliments. Id. at 334. Two weeks later, that same employee began asking her on dates. Several weeks later, that same employee asked her to a wedding. During this time, as well, that same employee called the plaintiff a "dumb blond." Id.

The fellow employee also asked the plaintiff to a bar, where he put his arm around the plaintiff's shoulder and tried to kiss her. A week later, the fellow employee put "I love you" signs at the plaintiff's desk. Id. The fellow employee tried to put his arm around the plaintiff six times. Finally, after over four months' employment, the fellow employee approached the plaintiff twice at her employer's front office and tried to kiss her. Id. The plaintiff pulled back and requested the fellow employee to stop. Id.

The Seventh Circuit held this conduct to be nonactionable under Title VII because it was infrequent and not sufficiently serious. Id. at 337. The court reasoned that such conduct was merely offensive and did not sufficiently alter the plaintiff's

9

employment situation into an abusive, hellish working environment that Title VII bars.  See id.; cf. Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir. 2002) (holding an environment sufficiently severe for a Title VII action when employee faced daily verbal assaults that were sexually explicit and saturated with other crude language).

Similarly, Plaintiff's allegations are not sufficiently frequent and serious.  Plaintiff experienced mild touching like Weiss's attempted kisses and touches, including Wilkes's popping with a plastic water bottle, fellow employees twice trying to lift, or engaging in conduct that might lead to a lifting of, Plaintiff's skirt, and Jones's infrequent side hugs during the year-long employment, leg touches on one car trip, or kisses at a local restaurant.

Additionally, similar to Weiss's statements such as "I love you," requests for dates, and hurtful names such as "dumb blond," Plaintiff experienced mild and infrequent verbal abuse.  For example, Wilkes once told Plaintiff to slow down in her stride because she was bouncing, commented that he could see Plaintiff's underwear, called Plaintiff a "dingbat" and "dumb blonde," and told her he knew she would have an affair with someone in the office.  Phipps once told Plaintiff that he wished to have sexual intercourse with her, and Poe once stated he would consider having sexual intercourse with Plaintiff.  Poe also once asked Plaintiff if she were wearing a thong and shared personal information about his love life.  Poe stopped describing acts

10

with his wife after Plaintiff told him to stop two or three times.  Jones once threw his arms into the air and stated he loved Plaintiff, stated he wished to have sexual intercourse with Plaintiff, suggested Plaintiff was familiar with directions to his house because of her frequent visits there, said he would "do her," and suggested it was a good thing she worked out because she did not have sexual intercourse as an outlet for her energy.  Jones also stated his desire to engage in sexual intercourse with women, commented on women's breasts and buttocks, told Plaintiff he favored small breasts, and commented to another employee, in Plaintiff's presence, that they should ask Plaintiff about various sexual techniques.

Plaintiff witnessed or experienced several acts of similar frequency and severity.  A fellow employee took a picture of Plaintiff's behind without Plaintiff's prior knowledge.  Jones showed Plaintiff a picture of a little boy with a large phallus superimposed upon him saying that this was he when he was young.

In sum, as in Weiss, Plaintiff's case shows a several-month span where various annoying and possibly offensive statements, events, and other acts occurred that were almost equally infrequent and severe.  Although the conduct in this case was over a longer span and included more instances, neither case presents a "hellish" environment akin to daily and vulgar offensive acts.  This environment is akin to one permeated with "simple teasing, sporadic use of abusive language, offhand comments, gender-related jokes, and isolated incidents (unless

11

extremely serious) [that do] not amount to discriminatory changes in the terms and conditions of employment." Jennings v. University of N.C. at Chapel Hill, ___ F.3d ___, ___ (4th Cir. 2006); cf., e.g., Smith v. First Union Nat'l Bank, 202 F.3d 234, 238-39, 242 (4th Cir. 2000) (finding a sufficiently hostile work environment when the plaintiff faced "a barrage of threats and gender-based insults" for over thirty times in the first weeks of employment, routine demeaning comments such as the plaintiff must "spread her legs" to advance with her employer, and threats because such conduct "intimidate[s], ridicule[s], and maliciously demean[s]" the plaintiff). Recalling that Title VII was not "designed to purge the workplace of vulgarity," Anderson, 281 F.3d at 459 (quoting Baskerville, 50 F.3d at 430; accord Hartsell, 123 F.3d at 773 ("Title VII is not a federal guarantee of refinement and sophistication in the workplace . . . ."), Plaintiff's hostile work environment claim fails as a matter of law, and summary judgment is appropriate.

    C.   Retaliation Claim

Title VII provides that, among other things, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). To state a claim under this provision, "a plaintiff must [first] show that (1) the plaintiff engaged in a protected activity . . . ; (2) the employer acted adversely against the plaintiff; and (3) the

12

protected activity was causally connected to the employer's adverse action." Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997). Other requirements follow this showing. See id. Because the court finds Plaintiff engaged in no protected activity, Plaintiff's retaliation claim fails as a matter of law.

Protected activity includes "an employee . . . participating in an ongoing investigation or proceeding under Title VII" or "for opposing [unlawful employment] practices in the workplace." Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). At issue here is whether Plaintiff "opposed" Defendants' alleged wrongful practices. "[I]mplicit in the [opposition] requirement [is that] the employer [must] have been aware of the protected activity[;] . . . it [must have] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." See Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Thus, the complaints given to the employer must show the employer that the plaintiff protested what she thought, in good faith, was improperly motivated conduct. See id.

Plaintiff argues that she complained to her employer about unlawful harassment, and for that reason, she was fired. Plaintiff highlights her complaints about Wilkes. Plaintiff told O'Shea and Jones that Wilkes was making offensive comments, such as names like "dingbat" and "dumb blond" after she wrecked a company car and suggestions that she would have an affair with

13

someone in the office.  Plaintiff also reported Wilkes's comments to Jones.  Nothing in these facts would reasonably suggest to her employer that her complaints about Wilkes covered sexual or gender-based harassment that Title VII could prohibit.  Her complaints evidenced a general annoying harassment from a fellow employee, not gender- or sexual-based harassment.  Thus, Plaintiff's retaliation claim fails as a matter of law.

    D.   Violation of North Carolina Public Policy

In support of her claim, Plaintiff argues since she refused continuous sexual advances of her supervisor and, subsequently, Defendants fired her for that refusal, she has a cause of action.  Plaintiff, without citation to the record, argues that Jones continually made sexual advances at her.  The court sees no evidence of continuous sexual advances made toward Plaintiff, and thus, Plaintiff's claim fails.  Judgment as a matter of law on this claim is appropriate.

**IV.  CONCLUSION**

For the reasons stated above,

Defendants' Motion for Summary Judgment will be granted.  An order and judgment in accordance with this opinion will be filed contemporaneously herewith.

This the 30th day of August 2006.

                                  */s/ William L. Osteen*
                                  United States District Judge