IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SERENA C. MOSER,           )
                           )
          Plaintiff,       )
                           )
     v.                    )          1:05cv00288
                           )
MCC OUTDOOR, L.L.C. and    )
SHIVERS TRADING & OPERATING CO.,  )
                           )
          Defendants.      )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

     This is an employment discrimination case for supervisor and co-worker hostile work environment sexual harassment brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Before the court is Defendants' renewed motion for summary judgment (Doc. 64), made upon remand from the court of appeals.  Defendants argue that Plaintiff's claims are barred by an affirmative defense that prevents recovery where an employee fails to report alleged harassment under reasonable mechanisms made available by the employer.  For the reasons that follow, the court concludes that summary judgment is appropriate as to the co-worker hostile work environment claim but that genuine issues of material fact prevent application of the affirmative defense to the claim of supervisor-created hostile work environment.  Thus, Defendants' renewed motion for summary judgment (Doc. 64) will be granted in part and denied in part.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff Serena Moser ("Moser") filed this action on April 4, 2005, alleging hostile work environment, quid pro quo harassment, retaliatory discharge, disparate treatment, and state law wrongful discharge claims arising from her employment and termination by Defendant MCC Outdoor, L.L.C. ("MCC Outdoor"). (Doc. 2.) On August 30, 2006, another judge of this court entered summary judgment in favor of Defendants on all of Moser's employment discrimination claims, including her Title VII hostile work environment claim. Moser v. MCC Outdoor, L.L.C., 459 F. Supp. 2d 415 (M.D.N.C. 2006). On appeal, the Fourth Circuit reversed the grant of summary judgment on the hostile work environment claims but otherwise affirmed the district court's decision. Moser v. MCC Outdoor, L.L.C., 256 F. App'x 634 (4th Cir. 2007). The Fourth Circuit held that there was sufficient evidence to create a genuine issue of material fact as to whether the conduct alleged was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment and thus remanded the case to this court for further proceedings. Id. at 639-40.

Defendants argued in their initial motion for summary judgment that the hostile work environment claims should be

2

dismissed for two reasons: first, because Moser failed to make out a prima facie case of hostile work environment harassment; and second, because Moser's claims were barred by the affirmative defense recognized by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), generally referred to as the *Faragher*/*Ellerth* affirmative defense. (Docs. 26 & 27.) That defense insulates an employer who exercises reasonable care to prevent and correct any harassing behavior where a plaintiff unreasonably fails to take advantage of the preventative or corrective opportunities offered.[1]  Because summary judgment was initially granted on the first ground sought, the court did not reach the applicability of the *Faragher*/*Ellerth* affirmative defense, *Moser*, 459 F. Supp. 2d at 420, which Defendants urge now on their renewed motion for summary judgment. (Docs. 64 & 65.)

On November 17, 2008, the court entertained oral argument on the renewed motion for summary judgment, the parties subsequently submitted court-ordered supplemental briefing (Docs. 79 & 81-82), and the matter is ready for decision.

---

[1]  To prevail on the *Faragher*/*Ellerth* affirmative defense, an employer must show by a preponderance of the evidence that (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765.

3

**B.  Facts**

Defendant MCC Outdoor is a Georgia corporation that does business in North Carolina as Fairway Outdoor Advertising of the Triad ("Fairway").  (Doc. 2 ¶ 10; Doc. 71 at 1.)  Morris Communications Company, LLC ("Morris Communications") is the parent company of MCC Outdoor, L.L.C.  (Doc. 22.)  Defendant Shivers Trading & Operating Co., is a privately held corporation with no parent corporation (Doc. 23) and appears to be the parent company of Morris Communications (Doc. 71 at 1; Doc. 72, Ex. 11 at 119-20).[2]

Eddie Jones, Fairway's sales manager, hired Moser, who began working as a sales representative in Fairway's Greensboro office on July 9, 2003.  (Doc. 72, Ex. 3 ¶ 3.)  Moser reported to Jones, who in turn reported to Dan O'Shea, the office general manager.  (Id., Ex. 3 at ¶ 4.)  Moser was discharged on June 30, 2004.  (Id. Ex. 3 at ¶ 3.)

The facts leading up to Moser's termination have been set out by this court and the Fourth Circuit in the two prior decisions.  See Moser, 459 F. Supp. 2d 415; Moser, 256 F. App'x 634.  Suffice it to say that Moser "at times contributed to the less than professional atmosphere at Fairway," Moser, 256 F.

---

[2]  The parties have not set forth in detail what role the parent companies allegedly played, although it is apparent that the anti-harassment policy was distributed and administered by Morris Communications.

App'x at 635, and neither side of this dispute is portrayed in a wholly favorable light.

Moser's claim of hostile work environment sexual harassment at Fairway is predicated on alleged sexual harassment by her supervisor, Jones, and her co-workers, Kelly Phipps, George Wilkes and Tom Poe. (Doc. 71 at 2-5.) With respect to Jones, Moser alleges a course of conduct involving statements and physical advances of a sexual nature towards her. (Id. at 2-7.) In substance, Moser's testimony sets forth a series of sexual advances beginning in January and February of 2004 and concluding twelve days before she was fired. The conduct includes statements that Jones hoped she would like him because he was older and financially secure (Doc. 72, Ex. 1 at 171), that he wanted to lose twenty pounds so she would like him (id., Ex. 1 at 171), that he wanted to have sex with her (id., Ex. 1 at 126), that she was a "hottie" (id., Ex. 1 at 127), that he wanted and needed to see her every day (id., Ex. 1 at 128), that he wanted to see her in a bikini (id., Ex. 1 at 118-19), and that he "would do [her] in a heartbeat" (id., Ex. 1 at 126). Jones also allegedly took repeated opportunities to treat her in a sexual way, including slipping his arm around her waist, hugging her, placing his hand on her thigh several times, looking down her blouse, and "eyeball[ing her] up and down

5

constantly." (<u>Id.</u>, Ex. 1 at 91, 107-11, & 119-20.) She contends that after Fairway distributed a May 25, 2004, memorandum to employees advising of the availability of a toll-free hotline number for reporting sexual harassment, Jones acknowledged his conduct by telling her on several occasions "you're going to get me for sexual harassment, aren't you?" (<u>Id.</u>, Ex. 1 at 167-68.)

On June 18, 2004, Moser testified, Jones cornered her in his office, pushed her against the back of the door, pressed himself up against her, looked straight down her blouse, and then said, "Serena, what do we need to do to get our relationship back on track?" (<u>Id.</u>, Ex. 1 at 89, 119-20, & 243-44.) Moser was "shaking like a leaf." (<u>Id.</u>, Ex. 1 at 243.) She contends that Jones fired her twelve days later on June 30, 2004, because, among other reasons, "he was worried she would report him for sexual harassment" and she no longer "fit in." (Doc. 71 at 14-15; Doc. 72, Ex. 1 at 98.)

Jones denies ever making any sexual advances toward Moser or ever touching her inappropriately. (Doc. 71; Doc. 72, Ex. 11 at 157.) Affidavits from Fairway sales associates Steve Brandt, Michael Curtis, Greg Hines, Lee Isley, Sherry Lutz and former sales associate Angela Poole indicate that they never saw Jones acting inappropriately or engaging in any sexual touching or

6

other harassing behavior with any female in the company, including Moser. (Doc. 65, Ex. 5 ¶ 6, Ex. 6 ¶ 10, Ex. 8 ¶ 10, Ex. 9 ¶ 5, Ex. 10 ¶¶ 6 & 8, Ex. 15 ¶¶ 4 & 6.) The record also contains affidavits from Accounting Department Manager Kathy Gibbs, Executive Secretary Susan Mills, and the administrative assistant to the sales/marketing team Amy Spence stating the same. (Doc. 65, Ex. 7 ¶¶ 5-6, Ex. 11 ¶¶ 6, 7 & 9, Ex. 17 ¶¶ 5 & 7.) These co-employees were not present, however, during the alleged one-on-one encounters Jones had with Moser.

With respect to her co-workers, Moser alleges that they made gender-based comments about her physical appearance (Doc. 72, Ex. 1 at 68), her intelligence (id., Ex. 1 at 50-51), and the fact that she was not married (id., Ex. 1 at 52-53), hit her on her buttocks with a water bottle (id., Ex. 1 at 134), indicated they wanted to have sex with her (id., Ex. 1 at 147-48), and warned her not to walk so fast because her breasts were bouncing (id., Ex. 1 at 152, 157). Moser contends that shortly after Fairway distributed the May 25, 2004, memorandum about the new company hotline to report harassment, co-workers Wilkes and Poe inquired of her whether she intended to report their conduct. (Doc. 71 at 11; Doc. 72, Ex. 1 at 104.) She contends that the harassing conduct of all culminated in her firing on June 30, 2004. (Id. at 7.)

7

The Defendants paint a very different picture. They contend Moser was fired as a direct result of her workplace behavior, focusing primarily on three incidents in which her allegedly unprofessional behavior caused problems in the workplace. (Doc. 65 at 16-17.)

The first of these incidents occurred on March 8, 2004, during a meeting with the Fairway sales staff. (Id. at 9.) At that meeting, Moser learned that another sales representative was calling on one of her prospects, Allen Tate, a realty company, to sell Fairway's advertising services. (Doc. 72, Ex. 1 at 58-59.) Jones testified that Moser "stormed out of our sales meeting" and then "stormed into my office," was "visually mad," and "lit into me." (Doc. 73, Ex. 6 at 66) O'Shea testified to witnessing "an absolute tantrum" by Moser, "complaining about Allen Tate, [and] just literally dressing [Jones] down." (Id., Ex. 11 at 58.) Afterwards, O'Shea advised Jones "not to ever let that happen again" and that if an incident like that did happen again, he should write a reprimand of Moser to "let her know in no uncertain terms that we will not tolerate that behavior." (Id., Ex. 11 at 58.)

A second incident occurred on April 14, 2004, when Moser entered Jones' office to allegedly "complain[] bitterly" about how "stupid" the company was and about her ongoing arguments

8

with co-employee George Wilkes. (Doc. 65, Ex. 2 at 104.) What occurred at the end of their conversation is disputed. Jones testified that Moser said "[w]ell, f-ck you, Eddie," using an expletive, and walked out of his office (id., Ex. 2 at 105), while Moser testified that she said, "[f]ine, you're getting on my nerves" and walked out (id., Ex. 2 at 80). O'Shea testified that he was in his office during the event and heard Moser utter an expletive toward Jones. (Doc. 72, Ex. 11 at 61.) According to O'Shea, Moser also told Jones, "you people are stupid. You people are cheap," to which Jones replied, "[i]f you're not happy here, you might want to look someplace else." (Id., Ex. 11 at 63.) O'Shea said that after the encounter, he "went right into [Jones'] office," and instructed Jones to "write her up." (Id., Ex. 11 at 61.) A written reprimand memorializing the March 8 and April 14 incidents was issued on April 19, 2004, and signed by both Jones and Moser. (Doc. 73, Ex. 9.) Defendants contend the written reprimand did not improve Moser's behavior. (Doc. 65 at 10.)

The final incident allegedly occurred on June 30, 2004. (Id.) Jones contends that the previous day Moser complained to him that the company was "stupid." (Id.) According to O'Shea, on the morning of June 30 he was forced to interrupt a telephone call with his immediate supervisor, Fairway's President, because

9

Moser was arguing so loudly with Wilkes that O'Shea had to step out of his office to direct her to stop. (Doc. 73, Ex. 11 at 68-69.) Jones testified that he was in his office that day and O'Shea, who was on the phone to his boss, ran out and said "'what is going on?' [and that] Serena had obviously been - was upset and yelling at somebody, enough to make [O'Shea] go out of his office." (Id., Ex. 6 at 118.) Jones heard Moser and saw O'Shea exit his office but could not make out what she said. (Id., Ex. 6 at 118.) When Jones approached O'Shea to discuss an alleged incident with Moser from the day before (the details of which neither Jones nor O'Shea have disclosed), O'Shea, upon hearing of yet another instance of what he deemed insubordination, decided to terminate Moser's employment immediately. (Id., Ex. 11 at 69-70.)

Defendants also cite as reasons for Moser's termination the "constant conflict[s] with other staff members that were instigated by [Moser], her condemnation of management [insubordination], her disruptive disposition, her failure and refusal to cooperate with others and her rude, arrogant and condescending treatment of others." (Doc. 65 at 10-11.) They point to Moser's admissions that she got into arguments with other employees, had personality clashes with other employees, and called other employees names such as "fat," "chubby" and

10

"baldy."   (Doc. 65 at 7-8 & Ex. 1; Doc. 72, Ex. 1 at 70-77.)
They also identify a meeting between Moser and Beverly Smith,
Fairway's accounting manager, in which Smith told Moser that her
behavior was inappropriate and that other employees could not
concentrate because she was frequently loud and distracting.
(Doc. 65 at 8 & Ex. 16 ¶¶ 7-10.)   Smith stated by affidavit that
Moser refused to discuss the issue with her and left Smith's
office abruptly before Smith had finished speaking.   (Id., Ex.
16 ¶ 10.)   Moser confirmed that the meeting occurred but claims
she was "highly offended" by Smith's statements concerning her
behavior in the office.[3]  (Id., Ex. 3; Doc. 72, Ex. 1 at 76.)

In addition, Defendants present testimony from other
employees that Moser was "obnoxious and abrasive," had,
unprovoked, pinched one employee's ear "so hard that it bled for
several hours" (Doc. 65, Ex. 5 ¶ 4), was "very confrontational,
loud, moody, angry and annoying" and "disruptive to [the] office
atmosphere" (id., Ex. 10 ¶ 4), and was generally "unprofessional
in the office" (id., Ex. 18 ¶ 7).   Defendants attribute Moser's
alleged disputes to what they deem her reaction to company
policy relating to commissions and essentially a free-for-all
competition amongst employees for accounts.   (Id. at 7.)

---

[3]   Moser also says that Smith engaged in discussions about sex, noting
to Moser (in front of Jones) that once Moser turned 50 she would no
longer be interested in sex.   (Doc. 72, Ex. 3 ¶ 37.)

11

Moser characterizes her conduct as within the office norm (which she says involved much banter and kidding, and even foul-mouthed comments, amongst co-workers), and disputes that her behavior was the cause of her discharge. (Doc. 72, Ex. 1 at 73-74, 83, 163-64.) She acknowledges participating in sometimes juvenile office conduct such as squirting a co-worker with a water gun and bantering with less than flattering nicknames, such as "fat," "chubby," and "baldy" (which terms she says others used as well) (id., Ex. 1 at 70-77), but points to testimony of other employees who never heard her scream or yell, as alleged (Doc. 73, Ex. 16 at 30-33 & 42, Ex. 1 at 35-44, & Ex. 14 at 34-35).

She also characterizes the March 8 and April 14 incidents differently and denies that the June 30 incident occurred at all. The March 8 incident, she argues, was a "falling-out with [Jones] on the Allen Tate account." (Doc. 72, Ex. 1 at 58.) She denies that she yelled at Jones but concedes she "did raise her voice." (Id., Ex. 3 ¶ 20.) She claims she left the meeting because she was concerned about being late for an appointment and had to use the restroom, and she denies having stormed out of the meeting or into Jones' office. (Id., Ex. 1 at 87, Ex. 3 ¶ 21.)

She argues that on April 14, she never used an expletive; rather, she contends as noted earlier that she said only that "[y]ou're getting on my nerves." (Id., Ex. 1 at 80.) Moreover, she denies ever using inappropriate language toward Jones and claims she never called the company or its management "stupid." (Id., Ex. 1 at 76-77, Ex. 3 ¶ 21.) She does admit, however, to signing the reprimand for this and the March 8 incident.[4] (Id., Ex. 1 at 80-81.) The reprimand indicated that any further incidents of "inappropriate or unprofessional behavior" would result in Moser's termination. (Doc. 73, Ex. 9.)

Moser also raises serious questions as to the veracity of O'Shea's sworn testimony as to the April 14 incident. (Doc. 71 at 18-22; Doc. 72, Ex. 11 at 67.) Jones testified that the incident occurred between nine and eleven in the morning, (Doc. 73, Ex. 6 at 109), yet Fairway's records indicate that O'Shea, who testified that he was present, was absent from the office from April 12-14, 2004. (Doc. 72, Exs. 8 & 10.) A rental receipt shows O'Shea rented a car from the Wilmington-New Hanover (North Carolina) Airport at 2:27 p.m. on April 14, 2004. (Doc. 72, Exs. 8 & 9.) O'Shea's supplemental affidavit states

---

[4]  Moser claims that the reprimand she signed had no reference to an expletive and it was not until later that she realized that Fairway claimed that she had cursed. She sought to write a response to the reprimand but claims that Jones responded, "I don't f-cking care what you do," using an expletive. (Doc. 72 at 81.)

13

that he was vacationing at Wrightsville Beach with his family during this period but had to return to Greensboro on April 14, 2004, for work-related reasons. (Doc. 73, Ex. 13 ¶ 6.) O'Shea contends that he drove directly from the car rental facility to his Greensboro office, a trip that admittedly took him two hours and forty-five minutes. (Id., Ex. 13 ¶ 7.) By his own account, the earliest O'Shea physically could have been in Greensboro was a little after 5 o'clock in the evening.

As to the events that led to her termination on June 30, 2004, Moser says she walked into a meeting that day during which Jones terminated her. (Doc. 72, Ex. 1 at 98.) She denies the precipitating events that Defendants claim occurred on that date. She specifically denies yelling at Wilkes and "kn[o]w[s] for a fact that [she] did not get into any argument with anyone or cause any commotion in June, 2004." (Id., Ex. 3 ¶ 30.)

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials demonstrates that no genuine issue as to any material fact exists, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party seeking summary judgment bears

14

the burden of initially demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If this burden is met, the non-moving party must then affirmatively demonstrate a genuine issue of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 817 (4th Cir. 1995).

The court is cautioned to be particularly careful when considering a motion for summary judgment in employment discrimination cases, because motive is often the critical issue. Ballinger v. N.C. Agr. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987). In addition, the non-moving party is entitled "to have the credibility of [her] evidence as forecast assumed, [her] version of all that is in dispute accepted, all internal conflicts in it resolved favorably to [her], the most favorable of possible alternative inferences from it drawn in [her] behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered." Charbonnages de Fr. v. Smith, 597 F.2d 406, 414 (4th Cir. 1979);

15

see Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197 (4th Cir. 2005).

**B.  Hostile Work Environment Claim**

Plaintiff's remaining claim is one traditionally known as "hostile work environment," which Defendants contend is barred by the Faragher/Ellerth affirmative defense as a matter of law. (Docs. 64, 65 & 74.)  To prevail on this claim, a plaintiff employee must show conduct that was (1) unwelcome, (2) based on the employee's gender, (3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and (4) imputable to the employer.  Caldwell v. Johnson, 289 F. App'x 579, 585 (4th Cir. 2008) (quoting Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001)).  Moser alleges hostile work environment harassment by both her supervisor and her co-workers.

The parties do not appear to dispute whether the conduct by Jones and her co-workers was unwelcome and based on Moser's gender (and so those elements are assumed for purposes of this motion), and the Fourth Circuit's opinion held that the forecasted evidence supports the existence of the third element. Moser, 256 F. App'x at 642.  Thus, the only element at issue for Moser's prima facie cases of hostile work environment is whether

16

the conduct by Jones and her co-workers is imputable to the Defendants.

          **1.    Supervisor-Created Hostile Work Environment Harassment and Application of _Faragher_/_Ellerth_ Affirmative Defense**

The Supreme Court has held that agency principles apply to the determination of whether discriminatory conduct is imputable to an employer. _Ellerth_, 524 U.S. at 757-765. Where a victimized employee suffers from an actionable hostile workplace created by her supervisor with immediate, or successively higher, authority over her, the employer is presumptively liable vicariously. _Id._ at 765; _Howard v. Winter_, 446 F.3d 559, 565 (2006). Whether the supervisor's alleged harassment is aided in the agency relationship depends on the actual authority of the supervisor over the employee to make tangible employment decisions. _Hill v. Lockheed Martin Logistics Mgm't Inc._, 354 F.3d 277, 286-87 (4th Cir. 2004) (en banc). In assessing whether an employer is strictly liable, the Supreme Court has "divided the universe of supervisor-harassment claims according to the presence or absence of an official act." _Pa. State Police v. Suders_, 542 U.S. 129, 150 (2004). In _Ellerth_, the Court stated:

> [W]e can identify a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the

harassment: when a supervisor takes a tangible
employment action against a subordinate. . . . A
tangible employment action constitutes a significant
change in employment status, such as hiring, firing,
failing to promote, reassignment with significantly
different responsibilities, or a decision causing a
significant change in benefits. . . . Whatever the
exact contours of the aided in the agency relation
standard, its requirements will always be met when a
supervisor takes a tangible employment action against
a subordinate.

524 U.S. at 760-63. In the precise terms of the Supreme Court's
holding, the affirmative defense is unavailable "when the
supervisor's harassment *culminates* in a tangible employment
action," and the employer is held strictly liable for the
supervisor's harassment. Id. at 765 (emphasis added); Faragher,
524 U.S. at 808 (emphasis added); Brown v. Perry, 184 F.3d 388,
394 (4th Cir. 1999); see also 1 B. Lindemann & P. Grossman,
Employment Discrimination Law 1353-54 (4th ed. 2007)
(characterizing employer liability as "automatic").

In this case, Defendants argue that Jones' harassment could
not have culminated in a tangible employment action and,
therefore, they can avoid liability by asserting the affirmative
defense. For the reasons set forth below, the court concludes
that genuine issues of material fact preclude Defendants from
entitlement to the defense as a matter of law.

That Jones was Moser's supervisor (Doc. 65 pp. 14-15; Doc.
71 at 3), that Moser was discharged (Doc. 64 at 11; Doc. 71 at

18

2), and that Moser's discharge was a "tangible employment action" (Doc. 65 at 15; Doc. 71 at 13) are undisputed. However, the parties disagree as to whether Jones or O'Shea made the decision to fire Moser and, as a corollary of that inquiry, whether Jones' alleged harassment culminated in Moser's termination. These determinations inform the ultimate issue of whether the Defendants may assert the <u>Faragher</u>/<u>Ellerth</u> affirmative defense. (Doc. 64 at 16-18; Doc. 71 at 13-17.)

### a. Whether Jones Was Principally Responsible for the Decision to Terminate Moser

To impute liability to the employer in a supervisor-created hostile work environment claim, an employee must demonstrate that the harassing supervisor was "'principally responsible for,' or the 'actual decisionmaker behind,'" the tangible employment action. <u>Hill</u>, 354 F.3d at 288-89 (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151-52 (2000)).

Defendants contend O'Shea, not Jones, was the principal decision-maker in Moser's termination. (Doc. 65 at 16-17.) They argue that if O'Shea was responsible for Moser's termination and Moser never reported any harassment by Jones to him, then any harassing conduct by Jones could not have culminated in her discharge because Jones had no part in the termination decision. (<u>Id.</u> at 16-17.) Defendants contend that

19

the June 30 incident, together with the two prior incidents of insubordination for which she was reprimanded and her generally disruptive conduct, caused O'Shea to "agree[] with Jones that it was time to end [Moser's] employment," and that O'Shea was the one who ultimately made the firing decision. (Id. at 16.)

Moser argues that Jones was principally responsible for her discharge. (Doc. 71 at 12-13.) She contends that it was Jones' harassing conduct, Moser's refusal to play along so as to "fit in," and Jones' mounting fear that she would report his harassment that culminated in Jones' decision to terminate her employment. (Id. at 13-15.) In support, she notes that Jones hired her and admitted that he had authority to fire her. (Doc. 73, Ex. 6 at 118, 120.) She also points to his own testimony that O'Shea "relied on [him] to run the sales department" (id., Ex. 6 at 74-75) and the fact Jones was the only supervisor who signed her April 19, 2004, written reprimand (id., Ex. 9) and her July 1, 2004, letter of notification of termination (id., Ex. 7). Her evidence is consistent with Jones' acknowledgment that his duties and responsibilities were to "hire, train, evaluate, coach and monitor" the sales staff. (Id., Ex. 6 at 19-20.) She also points to Jones' testimony that "she was on thin ice" (id., Ex. 6 at 118) just prior to her termination (suggesting he had the ability to fire her) and his statement

20

that "I made a mistake not firing her [Moser] when she said that
to me that day" (id., Ex. 6 at 118) in reference to the
April 14, 2004, incident. According to Moser, Jones told her
that he would have fired her earlier but for the fact that he
cared for her. (Doc. 72, Ex. 1 at 242-243.) Jones testified
that after meeting with O'Shea on June 30, 2004, "*[w]e made the
decision. Dan made the decision, and that was it*" (id., Ex. 11
at 118) (emphasis added). In contrast, O'Shea indicated that "I
truly don't manage the sales department. That's Eddie Jones'
department." (Doc. 71; Doc. 72, Ex. 11 at 29.)

Finally, and perhaps most importantly, is Moser's version
of her termination. She claims she was called into O'Shea's
office and Jones told her it was her last day because she was
"no longer happy here," "no longer fit in," and could not sell
because she was given 85 percent of her accounts. (Doc. 72, Ex.
1 at 98.) O'Shea, she says, replied, "Eddie, that is not true,"
referring to his statement about her lack of sales ability.
(Id., Ex. 1 at 98.) O'Shea then told her, according to Moser,
that she "no longer fit in anymore" (id., Ex. 1 at 98), which is
consistent with O'Shea's testimony that they told her they felt
she "no longer enjoyed being here" (Doc. 73, Ex. 11 at 70).
Moser says that O'Shea then looked to Jones and said, "*I back up
Eddie. He's the sales manager, whatever decision he makes, I*

*back him up.*" (Doc. 72, Ex. 1 at 98) (emphasis added); <u>see also</u> <u>Moser</u>, 256 F. App'x at 638.

The record contains conflicting evidence as to who made the final decision to fire Moser -- Jones points to O'Shea for having made the decision, while there is evidence that O'Shea points to Jones as being principally responsible for the decision. Although O'Shea is the general manager and Jones the supervisor of Fairway's Greensboro office, their nominal rank and formal titles are not determinative of who made the decision. The imposition of liability under Title VII is analyzed under agency principles, <u>Ellerth</u>, 524 U.S. at 754; <u>Faragher</u>, 542 U.S. at 790-92, and the critical inquiry is who was principally responsible for, or the actual decision-maker behind, an employment decision. <u>Hill</u>, 354 F.3d at 289. The Fourth Circuit explained that "[w]hen a formal decision-maker acts merely as a cat's paw for or rubber stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decision-maker or the one principally responsible for the contested employment decision." <u>Id.</u> at 290. However, a subordinate "who has no supervisory or disciplinary authority and who does not make the final or formal employment decision" should not be deemed a decision-maker for purposes of

22

attributing liability to an employer "simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision." Id. at 291.

Viewing the evidence in the light most favorable to Moser as the non-moving party, the court finds that she has created a genuine issue of material fact as to whether Jones or O'Shea was principally responsible for the decision to fire her. Id. at 291 (holding that in order to survive summary judgment on a Title VII discrimination claim based on the discriminatory motivations of a subordinate employee, an aggrieved employee "must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer"); see Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 511 (11th Cir. 2000) (holding that where the parties present conflicting evidence regarding the identity of the decision-maker who took the tangible employment action, the parties have created "a classic dispute of a material fact").

### b. Whether the Alleged Harassment Culminated in Moser's Termination

As a corollary to who made the decision to terminate Moser, Defendants challenge the connection between any alleged

23

harassment and Moser's termination. Defendants argue that even if one assumes that Jones was principally responsible for firing Moser, they are entitled to assert the Faragher/Ellerth affirmative defense because Moser cannot demonstrate that Jones' alleged harassment culminated in Moser's termination. (Doc. 65 at 16-18.)

The case law indicates that "culminated" in the context of imputing employer liability under Faragher and Ellerth contemplates a causal relationship. Lissau v. S. Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998) (noting that if plaintiff's termination did not "result from" a refusal to submit to a supervisor's sexual harassment, the employer may assert the Faragher/Ellerth affirmative defense)[5]; see Suders, 542 U.S. at 140-41 (concluding, in a constructive discharge case, that the Faragher/Ellerth affirmative defense is unavailable when a supervisor's conduct "precipitates" the tangible employment action); Ferraro v. Kellwood Co., 440 F.3d 96, 102 (2d Cir. 2006) ("The word 'culminate' requires that the tangible employment action be linked to the supervisor's

---

[5]   The concurring opinion questioned this articulation of "result[ing] from," indicating that the Faragher/Ellerth defense is unavailable in a broader range of circumstances where the supervisor takes a tangible employment action against an employee "as part of the harassment" or if the termination was "connected to" the harassment. Lissau, 159 F.3d at 184 (Michael, J., concurring in part and concurring in the judgment).

discriminatory harassment."); <u>Elvig v. Calvin Presbyterian</u>
<u>Church</u>, 375 F.3d 951, 959-60 (8th Cir. 2004) (noting that even
if a tangible employment action occurred, the employer may still
assert the affirmative defense if the tangible employment action
is "unrelated to" the alleged harassment); <u>Church v. Maryland</u>,
180 F. Supp. 2d 708, 728-29 (D. Md. 2002) ("[t]o establish that
the harassment 'culminated' in a tangible employment action,
plaintiff must establish a causal connection between the
harassment and the action") (quoting <u>Jaudon v. Elder Health,</u>
<u>Inc.</u>, 125 F. Supp. 2d 153, 161 (D. Md. 2000)).

Defendants contend that the court's dismissal of Moser's
quid pro quo, retaliation, and discriminatory discharge claims
predicated upon the same pre-termination conduct and the Fourth
Circuit's affirmance of that determination on appeal bars any
finding of a causal relationship. In other words, Defendants
contend, Plaintiff has litigated and lost her claims that her
termination was the result of any unlawful conduct. In the
alternative, they contend that they have demonstrated a
legitimate, non-discriminatory reason for Moser's termination
based on her performance.

It is true that a termination, in order to be related to
the alleged harassment, is ordinarily a result of either quid
pro quo or retaliatory discrimination. <u>Booker T. Washington</u>,

25

234 F.3d at 508 (noting that "[g]enerally sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as '*quid pro quo*' harassment)" (emphasis in original)).  In <u>Ellerth</u> and <u>Faragher</u>, however, the Supreme Court eschewed the labels "quid pro quo" and "hostile work environment" in the context of assessing employer liability in favor of an analysis of whether (1) the employee suffered harassment that "culminated" in a tangible employment action, or (2) if no tangible employment action existed, the harassment was sufficient to constructively alter an employee's working conditions.[6]  <u>Ellerth</u>, 524 U.S. at 761-63, 765; <u>Faragher</u>, 524 U.S. at 790, 807.  Further, the Court recently found that a hostile work environment claim culminating in a constructive discharge could bar the defense.  <u>Suders</u>, 542 U.S. at 141.

Moser's complaint alleged quid quo pro sexual harassment, claiming that her termination resulted from a refusal to submit

---

[6]    While within the broad category of workplace sexual harassment prohibited by Title VII there are various types of claims treated distinct from each other analytically, the Supreme Court has cautioned that "quid pro quo" and "hostile work environment" terminology is useful only in "making a rough demarcation between cases in which threats [to take tangible adverse employment action against the target of the harassment] are carried out and those where they are not or are absent altogether." <u>Ellerth</u>, 524 U.S. at 751.

to her supervisor's demands. (Doc. 2 at 9.) She also alleged discriminatory discharge as a result of alleged discriminatory practices in violation of Title VII. (Id. at 10-12.) Both the quid pro quo and discriminatory discharge claims were dismissed for procedural default, however. Moser, 459 F. Supp. 2d at 420. Those dismissals have been affirmed on appeal.[7] Moser, 256 F. App'x at 642. Moser's complaint also alleged that her termination was in retaliation for her alleged complaints about Defendants' harassment. (Doc. 2 at 9-10.) However, at summary judgment, she only offered evidence that she complained about the conduct of George Wilkes, her co-worker, and not the conduct of Jones or of any other supervisor. The district court dismissed her retaliation claim on the ground that Title VII did not prohibit the conduct by Wilkes about which she complained. Moser, 459 F. Supp. 2d at 422-23. That determination has been affirmed on appeal as well. Moser, 256 F. App'x at 642-44.

While the issue is novel and close, the court concludes that these prior dismissals do not bar Moser's current attempt to establish that the alleged supervisor harassment culminated in her termination. Under the law of the case doctrine,[8] a court

_____

[7] Moser did not challenge the dismissal of the discriminatory discharge claim on appeal. Moser, 256 F. App'x at 643 n.3.

[8] "[Law of the case rules] govern within a single action . . . [and] do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment." 18B Wright, Miller & Cooper,

27

has the discretion to preclude a party from re-litigating an issue previously decided in the same case. See, e.g., Pit River Home & Agric. Co-Op. Ass'n v. United States, 30 F.3d 1088 (9th Cir. 1994) ("The law of the case is a discretionary [doctrine] created to maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit, of those decisions that are intended to put a matter to rest."). Here, with respect to those claims dismissed for procedural default, no issue of fact was actually decided for purposes of the rule, and those dismissals should not serve to bar her now. United States v. Lentz, 524 F.3d 501, 528 (4th Cir. 2008). As far as the court can tell, Moser's current claim of supervisor harassment leading to her termination was never raised in the context of her dismissed claims, and no finding of fact has been made as to it.[9] Inasmuch as Moser seeks no termination damages

_____

Federal Practice and Procedure § 4478 at 638-40 (2nd ed. 2002). In contrast, issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." Taylor v. Sturgell, 128 S. Ct. 2161, 2171 (2008) (internal quotation marks omitted). The doctrine only applies where "(1) the identical issue (2) was actually litigated (3) and was critical and necessary to a (4) final and valid judgment (5) resulting from a prior proceeding in which the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue." McHan v. Comm'r, 558 F.3d 326, 331 (4th Cir. 2009).

[9] Rather, in her initial brief in opposition of summary judgment, Moser argued in connection with her supervisor-created hostile work environment claim that Jones fired her because she "would not succumb to his advances and he was worried she would report him for sexual harassment." (Doc. 48 at 13.) The district court never reached this

(those claims having been dismissed) but only hostile workplace damages, the court concludes that she is not precluded from showing that her termination was causally-related to Jones' alleged harassment for the sole purpose of imputing his actions to the Defendants.

Faragher and Ellerth "in no way indicate that a variation from the normal requirements of Rule 56 is appropriate." Lissau, 159 F. 3d at 182 n.*. On motion for summary judgment, the court is bound to accept the non-movant's version of all disputed facts and assume the credibility of the forecasted evidence. Metric/Kvaerner, 403 F.3d at 197. In this case, the court concludes that Moser has presented a genuine issue of material fact as to whether Jones' alleged harassment culminated in her termination. For example, as noted in the extensive factual discussion, she alleges that Jones made several passes at her that she rebuffed, including one less than two weeks before her termination when Jones allegedly cornered her in his office, pushed her against the back of the door, pressed himself up against her, looked straight down her blouse, and said, "Serena, what do we need to do to get our relationship back on track?" (Doc. 72, Ex. 1 at 89, 119-20, & 243-44.) She also

_____

argument in dismissing the claim on the grounds, now reversed, that Jones' conduct was not sufficiently severe or pervasive. Moser, 459 F. Supp. 2d at 421.

contends Jones fired her twelve days later on June 30, 2004, because, among other reasons, he expressed concern she would report him for sexual harassment and she no longer "fit in." (Doc. 71 at 14-15; Doc. 72, Ex. 1 at 98.) While Jones denies these allegations, they are sufficient to permit Moser to proceed at this stage. Booker T. Washington, 234 F.3d at 511 (holding a genuine issue of material fact existed where plaintiff presented evidence that she rebuffed the sexual advances of a supervisor who participated in a decision to move the television slot assigned to her, while defendants produced evidence that another supervisor made the personnel decision based on performance-related criteria); Burrell v. Star Nursery, Inc., 170 F.3d 951, 956 (9th Cir. 1999) (remanding case for a determination of the causation question where there was evidence that termination could have been a result either of plaintiff's own misconduct or the culmination of her rejection of her supervisor's sexual advances); Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 204-05 (N.D.N.Y. 2002) (finding factual dispute for jury determination over issue of culmination where plaintiff alleged she was terminated for lodging a complaint about her supervisor's harassing conduct but defendant presented evidence that she was terminated for violating the alcohol policy); Wright v. Blythe-Nelson, No. Civ. A. 399CV2522D, 2001 WL

30

1012702, at *4 (N.D. Tex. Aug. 15, 2001) (holding evidence of an employee's refusal to engage in sexual intercourse with supervisor and her termination four months later was sufficient to preclude summary judgment on whether her termination was the culmination of the alleged harassment).

This is simply not a case where the absence of any relationship between the alleged discriminatory conduct and Moser's termination can be demonstrated beyond genuine dispute, especially given Jones' direct involvement in both the alleged discrimination, forecasted as extensive, and the termination process. Cf. Hill, 354 F.3d at 295 (holding that where employee failed to contend that final reprimand was motivated by discriminatory animus, employee's evidence was insufficient to support finding that immediate supervisor was principally responsible for termination decision made by employer's higher level management); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 877-78 (9th Cir. 2001) (finding that employee's termination was "unrelated" to any harassment where employee walked off job after heated argument (without any evidence it was related to alleged workplace discrimination) with a manager and was fired for leaving work before his shift ended); Frederick v. Sprint/United Mgm't Co., 246 F.3d 1305, 1312-13 (11th Cir. 2001) (affirming summary judgment for employer where

31

plaintiff failed to show sufficient evidence of causal link between the harassment and the tangible employment action); Johnson v. West, 218 F.3d 725, 731 (7th Cir. 2000) (finding no causation between harassment and termination where plaintiff was fired pursuant to a full administrative investigation); Fierro v. Saks Fifth Ave., 13 F. Supp. 2d 481, 491 (S.D.N.Y. 1998) (finding that dismissal of retaliation claim precluded a finding that the tangible employment action was related to the alleged harassment).

Defendants argue that they have presented a legitimate, non-discriminatory reason for terminating Moser's employment and, under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), are entitled to prevail on the issue of culmination.[10] The court need not decide whether McDonnell Douglas applies to the culmination determination because, even if such burden-shifting were to apply, Moser has presented evidence that the Defendants' reason is pretextual.

---

[10] Moser appears to accept that the burden-shifting analysis applies, though neither party has cited to any case applying it in the context of determining culmination for purposes of asserting the Faragher/Ellerth affirmative defense, and there is some authority to the contrary. Cf. Booker T. Washington, 234 F.3d at 510-11 (rejecting application of the burden-shifting framework in deciding whether to allow the Faragher/Ellerth affirmative defense). But see EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors in the Wake of Ellerth/Faragher 6 (June 18, 1999), available at http://www.eeoc.gov/policy/docs/harassment.html#IVC, (indicating that burden-shifting analysis applies if employer produces evidence of non-discriminatory motive).

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993) (holding that the presentation of a non-discriminatory reason merely satisfies a defendant's burden of production and rebuts the presumption raised by the plaintiff's prima facie case).

While it is uncontested that Moser was reprimanded for the March 8 and April 14 incidents, Fairway did not terminate her at that time, and a key question is Fairway's alleged justification for terminating Moser as of June 30, 2004. The credibility of the Defendants' version of the events on June 30 turns on the testimony of Jones, the alleged protagonist who admittedly was unable to testify to the details of what happened on that date, and on the testimony of O'Shea, which a reasonable jury could discredit in light of his troubling claim to have been present at the April 14 incident despite substantial evidence to the contrary. Reeves, 530 U.S. at 147 (finding that "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"); Fuentes v. Perskie, 32 F.3d 759, 764 n.7 (3d Cir. 1994) (noting that where a witness' testimony is called into doubt on one point, a jury will be free to disregard his testimony in whole or in part). Given the conflicting testimony about the office environment, a reasonable jury could also credit Moser's denials of the accusations against her and her

33

claim that Jones renewed his hostile activity a little more than a week before her termination.[11]   Thus, Moser has come forward with evidence that not only is the Defendants' proffered non-discriminatory reason for firing her false, but that the decision was pretext for discrimination.   <u>Jiminez v. Mary Washington Coll.</u>, 57 F.3d 369, 378 (4th Cir. 1995).

Because material factual issues exist as to whether Jones or O'Shea was principally responsible for the decision to fire Moser and, consequently, whether her termination was the culmination of Jones' alleged harassment, Defendants' motion for summary judgment on Moser's supervisor-created hostile work environment harassment claim is denied.

### 2.   Co-Worker Hostile Work Environment Harassment

Unlike the supervisor-created harassment context where the "aided in the agency relation" standard applies, an employer is liable for sexual harassment by a co-worker "if it knew or should have known about the harassment and failed to take

---

[11]   To be sure, Plaintiff's "mere denial of conduct does not, in itself, create a sufficient fact issue as to the legitimacy of Defendants' reason for her termination."   <u>Barnett v. City of Greensboro</u>, No. 02-cv-366, 2002 WL 32086528, at *7 (M.D.N.C. Nov. 7, 2002).   This is not a case, however, where there is "only a weak issue of fact as to whether the employer's reason was untrue and abundant and uncontroverted independent evidence that no discrimination occurred."   <u>Reeves</u>, 530 U.S. at 148.

34

effective action to stop it."[12]  _Howard_, 446 F.3d at 565
(internal quotation marks omitted).  "[A]n employee claiming
harassment by a co-worker bears significant responsibility in
notifying the employer."  _Id._ (quoting _Barrett v. Applied_
_Radiant Energy Corp._, 240 F.3d 262, 268 (4th Cir. 2001) (noting
that "[l]ittle can be done to correct [harassing] behavior
unless the victim first blows the whistle on it").  This
requirement aids in fulfilling Title VII's basic policy "of
encouraging forethought by employers and saving action by
objecting employees."  _Faragher_, 524 U.S. at 807.

        The first inquiry is actual notice.  As the Fourth Circuit
has cautioned, "[t]he law against harassment is not self-
enforcing and an employer cannot be expected to correct
harassment unless the employee makes a concerted effort to
inform the employer that a problem exists."  _Howard_, 446 F.3d at
567 (internal quotation marks omitted).  Here, Moser claims that
she complained to O'Shea that co-worker Wilkes' comments
demeaning her intelligence were "offensive."  (Doc. 71 at 2-3.)
She also says she complained to Jones that Wilkes would ask why
she was not married.  (Doc. 72, Ex. 1 at 52-53.)  This court has
already found, and the Fourth Circuit affirmed, that Moser's

---

[12]  The Supreme Court observed that "_Ellerth_ and _Faragher_ expressed no
view on the employer liability standard for co-worker harassment."
_Suders_, 524 U.S. at 143 n.6.

complaints about Wilkes did not concern protected conduct. <u>Moser</u>, 256 F. App'x at 644. The possibility that a contrary finding should be made is therefore foreclosed.

Absent actual notice, an employer cannot rely on a "see no evil, hear no evil" defense, however. <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 334 (4th Cir. 2003) (internal quotation marks omitted). Knowledge of co-worker harassment can be imputed to an employer "if a reasonable person, intent on complying with Title VII, would have known about the harassment." <u>Id.</u> Constructive knowledge of co-worker harassment may be charged when a defendant fails to provide reasonable procedures for victims to register complaints. <u>Id.</u>

It is undisputed that Fairway had in place a company "Employee Harassment Policy," which prohibited harassment and provided a reporting process for suspected harassment that included a toll-free telephone number to contact the corporate human resources department in Augusta, Georgia. (Doc. 65, Ex. 1, Ex. 4.) The policy is robust in its declaration as to prohibited activities and appropriate avenues for reporting misconduct:

EMPLOYEE HARASSMENT POLICY

> Morris Communications Company, LLC does not and will not tolerate harassment of our employees. The term 'harassment' includes, but is not limited to, slurs, jokes and other verbal, graphic or physical conduct

36

relating to an individual's race, color, sex, religion, national origin, citizenship, age or disability. Harassment also includes sexual advances, requests for sexual favors, unwelcome or offensive touching, and other verbal, graphic, or physical conduct of a sexual nature, or if such conduct has the effect of unreasonably interfering with an affected person's work performance or creating an intimidating, hostile, or offensive work environment.

Any employee that feels they have been harassed in any way by a supervisor, co-worker, customer, or vendor, or by an employee of a customer vendor, should notify his or her Department Head, Publisher, General Manager, Human Resources Manager or other designated individual immediately. All formal harassment complaints will be investigated and Morris' complaint procedures will be initiated and followed. A formal report will be reviewed with the complaining employee after the investigation. When appropriate, disciplinary action will be taken.

No supervisor or other member of management has the authority to suggest to any employee that the employee's continued employment or future advancement will be affected in any way by that employee's entering into (or refusing to enter into) any form of personal relationship with a supervisor or member of management.

If an employee feels that a supervisor or member of management has acted inconsistently with this policy or that his or her complaint concerning a manager, supervisor, co-worker, customer or vendor, or an employee of a customer or vendor has not been thoroughly investigated, he or she should contact the Corporate Human Resources Department at 800-622-6358, extension 3787, or 706-823-37878.

An employee will not be penalized for reporting such contact and it will be kept as confidential as possible.

VIOLATIONS OF THIS POLICY WILL SUBJECT AN EMPLOYEE TO DISCIPLINARY ACTION UP TO AND INCLUDING IMMEDIATE DISCHARGE.

(Doc. 65, Ex. 1, Ex. 5.) Moser acknowledged receipt of this policy upon her hiring. (Id. Ex. 1, Ex. 5.)

Further, on May 25, 2004, Fairway distributed a memorandum to employees that announced an additional avenue for reporting that included a confidential toll-free telephone "hotline" number administered by an outside company, as well as telephone and email contact information within the company. (Id., Ex. 1, Ex. 6.) The memorandum reiterated that the company "does not permit retaliation of any kind for good faith reports of ethical violations." (Id., Ex. 1, Ex. 6.) Moser signed the memorandum, indicating her receipt. (Id., Ex. 1, Ex. 6.) Apart from Moser's comments about Wilkes which the court has previously addressed, there is no evidence that Moser ever employed any of these mechanisms, nor does she claim or provide evidence that the policy was not effectively enforced by the Defendants.[13] Cf. White v. BFI Waste Servs., LLC, 375 F.3d 288, 299-300 (4th Cir. 2004).

On this record, Moser has failed to provide any basis from which a jury could reasonably conclude that Fairway should have

---

[13] Though Moser testified that O'Shea discouraged direct reporting without talking to him first because "[p]eople make bad choices" (Doc. 65, Ex. 1 at 104), and Kathy Gibbs testified that O'Shea stressed that employees should bring problems to his attention before calling the hotline (Doc. 73, Ex. 1 at 30), there is no evidence that Moser refrained from reporting any claim for these reasons, or that she either tried to contact, or feared contacting, O'Shea.

known about the alleged harassment of the co-workers. Absent is sufficient evidence to support a conclusion that Defendants knew of the alleged conduct but turned a blind eye to it. Nor is there a basis for imputing constructive knowledge of co-worker harassment to the Defendants. Accordingly, Defendants' renewed motion for summary judgment as to Moser's claims of hostile work environment based on the conduct of her co-workers is granted.

## III. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that the Defendants' renewed motion for summary judgment (Doc. 64) is GRANTED as to Moser's her co-worker hostile work environment claim and DENIED as to Moser's supervisor-created hostile work environment claim.

/s/   Thomas D. Schroeder
United States District Judge

June 25, 2009